*Haissaun Mitchell et al. v. Rite Aid of Maryland, Inc., et al.*
No. 21, Sept. Term 2022
Opinion by Leahy, J.

**Tort Law > Workers' Compensation Immunity > LE § 9-509**

Under Section 9-509 of the Maryland Workers' Compensation Act which is codified in Title 9 of the Maryland Code (1991, 2016 Repl. Vol., 2021 Supp.), Labor & Employment Article ("LE"), the liability of an employer for injuries to an employee while on the job is exclusive to a claim in workers' compensation. Section 9-509 "vindicates an essential and basic tenet of workers' compensation law—limited employer liability." *Great Atl. & Pac. Tea Co., Inc. v. Imbraguglio*, 346 Md. 573, 582 (1997). At its core, this tenet effectuates a compromise in which, in exchange for forfeiting their rights to bring an action in tort, employees "are provided the prospect of swift and sure compensation, without regard to fault, under other provisions of the Act." *Id.*

**Tort Law > Workers' Compensation Immunity > Third Party Tortfeasors**

Under Section 9-902 of the Maryland Workers' Compensation Act, "covered employees" may, under certain circumstances, maintain an action against a culpable third-party tortfeasor.

**Tort Law > Workers' Compensation Immunity > Employer-Employee Relationship > Control of the Worker > Summary Judgment**

At the summary judgment stage, if the evidence supports an inference that more than one business possessed control over the plaintiffs, then "the question of whether an employer-employee relationship exists is a question of fact to be determined by the jury[.]" *Tyson Farms, Inc. v. Uninsured Employers' Fund*, 471 Md. 386, 417 (2020) (quoting *Mackall v. Zayre Corp.*, 293 Md. 221, 230 (1982)).

**Tort Law > Workers' Compensation Immunity > Employer-Employee Relationship > Control of the Worker > Summary Judgment**

Guided by well-defined precedent in *Tyson Farms, Inc. v. Uninsured Employers' Fund*, 471 Md. 386 (2020), *Great Atl. & Pac. Tea Co., Inc. v. Imbraguglio*, 346 Md. 573 (1997), and *Whitehead v. Safway Steel Prods., Inc.*, 304 Md. 67 (1985), we conclude that genuine disputes of material fact precluded a determination of whether Rite Aid was the Mitchells' employer on summary judgment. Specifically, we observe that the prospect that Rite Aid maintained ultimate control over its facility and directed Capstone's supervisors on the services to be provided is not necessarily inconsistent with the possibility that the Mitchells remained employees of an independent contractor free from Rite Aid's control, except as to the final product of their work.

**Tort Law > Premises Liability > Duty to Provide Security Measures to Business Invitees > Foreseeability**

To avoid summary judgment on a premises liability claim arising out of the criminal act of a third party, the plaintiff must show that such activity was foreseeable. *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 491, 497 (2011). The Mitchells did not establish that the shooter's attack was a reasonably foreseeable criminal act because (a) there was no history of violent criminal activity in the vicinity of facility, (b) there was no indication that the shooter, a temporary worker employed through a different staffing agency, posed a threat of violence, and (c) the events immediately preceding the shootings did not presage any imminent violent outburst. Thus, because Rite Aid lacked any notice, its duty as a possessor "to take *reasonable* measures . . . to eliminate the conditions contributing" to foreseeable criminal activity was never generated. *Id.* at 496-97 (emphasis in original).

**Tort Law > Premises Liability > Proximate Cause > Foreseeability**

To establish the element of causation, the plaintiff must show that the defendant's conduct (1) was a but-for cause of the plaintiff's injuries, or, if one of multiple causes, that "it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries" and (2) that the plaintiff's "injuries were a foreseeable result of the negligent conduct." *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 504-05 (2011). The evidence produced by the Mitchells failed to generate any material issue of fact on the element of causation because the Mitchells' proffered security expert could not identify any causal link between the perceived breaches and the Mitchells' injuries. Moreover, the Mitchells simply did not produce any evidence indicating that Rite Aid was on notice that the shooter posed a threat of violence to the other workers at the facility or demonstrate how, considering the baseline security measures already in place at the Rite Aid facility—including two layers of access controls and patrolling security guards—Rite Aid realized or should have realized it "created a situation which afforded an opportunity to the third person to commit such a tort or crime." *Id.*, 201 Md. App. at 509-10.

**Tort Law > Negligent Hiring, Supervision, and Retention > Duty to Conduct Reasonable Background Investigation**

"[A]n employer has a duty 'to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee[.]'" *Perry v. Asphalt & Concrete Servs., Inc.*, 447 Md. 31, 52 (2016) (quoting *Henley v. Prince George's Cnty.*, 305 Md. 320, 336 (1986)). The record reflects that Abacus conducted a reasonable inquiry into the shooter's fitness as an employee that simply failed to reveal certain red flags which tend to evade most standard background checks. Absent any admissible evidence of its negligence, the circuit court did not err in granting summary judgment in favor of Abacus.

Circuit Court for Baltimore County
Case No. C-03-CV-20-000041

<u>REPORTED</u>

<u>IN THE APPELLATE COURT</u>

<u>OF MARYLAND</u>*

No. 21

September Term, 2022
_____

HAISSAUN MITCHELL, ET AL.

v.

RITE AID OF MARYLAND, INC., ET AL.
_____

Berger,
Leahy,
Zic,



JJ.
_____

Opinion by Leahy, J.
_____

Filed: March 2, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

It is a somber and sobering fact that the steady increase in the number of mass shootings[1] has impelled both public and private organizations to begin considering security measures responsive to that risk.[2] This appeal arises out of the tragic mass shooting that occurred on September 20, 2018, at a warehouse facility leased by appellee, Rite Aid of Maryland, Inc. ("Rite Aid") in Aberdeen, Maryland. The shooter, Snochia Moseley ("Moseley"), was an employee of appellee, Abacus Corporation ("Abacus"), temporarily assigned to work in Rite Aid's facility. On the day in question, Moseley gained access to

---

[1] The number of mass shootings has been steadily increasing, as reflected in our news media coverage as well as in professional and academic studies and reports. Even under the FBI's relatively narrow definition of what constitutes a mass shooting, there were 61 mass shooting incidents across the United States in 2021—slightly more than one per week—as compared to 31 such incidents in 2017. *See Active Shooter Incidents in the United States in 2021*, FED. BUREAU OF INVESTIGATION, (last visited Feb. 15, 2023), *archived at* https://perma.cc/E46E-SC6U. *Compare* GUN VIOLENCE ARCHIVE, https://www.gunviolencearchive.org/past-tolls/ (last visited Feb. 15, 2023) (defining a mass shooting to involve four or more people injured or killed, exclusive of the shooter, and reporting an increase from 349 mass shootings in 2017 to 690 mass shootings in 2021).

[2] Private organizations have increased their demand for insurance policies covering liability for an active shooter event. As one insurer very recently reported, the company experienced a 10-15% increase in rates for its deadly weapons coverage, with clients seeking to purchase policies with limits of "$5-10 million in losses, compared to $1-3 million four years ago." Noor Zainab Hussain, *Mass Shooting Insurance Rates Jump as Incidents Rise*, INSURANCE JOURNAL (June 29, 2022), *archived at* https://perma.cc/NGL7-DX4B?type=image. The California Division of Occupational Safety and Health proposed a regulation in May 2022, still pending at the time of this writing, which would require employers to develop and implement workplace violence prevention programs, trainings, and incident response plans. Karen F. Tynan & Robert C. Rodriguez, *Cal/OSHA and Workplace Violence Prevention: What is An Employer's Duty Under Current Standards and Guidelines?*, OGLETREE DEAKINS (Feb. 1, 2023), *archived at* https://perma.cc/V3VP-PU88; *see also*, Michael Steinlage, *Liability for Mass Shootings: Are We At A Turning Point?*, AMERICAN BAR ASSOCIATION (Feb. 7, 2020), *archived at* https://perma.cc/NA69-U45D.

1

the facility using her ID badge and proceeded to open fire on her coworkers, killing three and wounding three more.[3] Appellants—Haissaun Mitchell ("Haissaun"), Shyheim Mitchell ("Shyheim"), and Michael Mitchell ("Michael") (collectively, "the Mitchells")— worked for Pinnacle Workforce Logistics, LLC, d/b/a Capstone Logistics, LLC ("Capstone") as temporary laborers at the facility. Haissaun, Shyheim's brother and Michael's son, was shot in the leg during Moseley's attack and all three suffer ongoing emotional and physical repercussions from the trauma they experienced that day.

The Mitchells filed suit against Rite Aid and Abacus in the Circuit Court for Baltimore County, Maryland. In their two-count complaint, the Mitchells alleged that they suffered damages proximately caused by Rite Aid's and Abacus's (1) negligent failure to provide adequate security at the Aberdeen facility, and (2) negligent hiring and supervision of Moseley. Following discovery, the circuit court granted the summary judgment motions filed by Rite Aid and Abacus. The Mitchells noted a timely appeal and present five questions for our review, which we condense and restate as follows:[4]

---

[3] Appellant Haissaun Mitchell was one of the three persons shot in the attack who survived. The other two surviving shooting victims are not parties to the present appeal.

[4] The Mitchells present the following five questions in their brief:

I. "Did the Court err in holding that Appellants, as employees of Capstone logistics, were instead employees of Appellee Rite Aid and thus making Appellee Rite Aid immune from suit under Md. Lab.& Empl. §9-509?

II. Did the Court err when it failed to recognize Appellee Rite Aid's duty of adequate security on the premises?

III. Did the Court err when it failed to recognize the negligence of Appellee Rite Aid was both the legal and proximate cause of Appellants' injuries?

(continued)

2

I.      Did the circuit court err in holding that the Mitchells, as employees of Capstone Logistics, were also employees of Rite Aid and thus statutorily barred under the Maryland Workers' Compensation Act from bringing an action in tort against Rite Aid?

II.     Did the circuit court err in granting Rite Aid's motion for summary judgment on the Mitchells' premises liability claim?

III.    Did the circuit court err in granting Abacus's motion for summary judgment on the Mitchells' negligent hiring and supervision claim?

We hold that the circuit court erred, in part, by granting Rite Aid's motion for summary judgment on the ground of workers' compensation immunity. Guided by well-defined precedent in *Tyson Farms, Inc. v. Uninsured Emps.' Fund*, 471 Md. 386 (2020), *Great Atlantic & Pacific Tea Co., Inc. v. Imbraguglio*, 346 Md. 573 (1997), and *Whitehead v. Safway Steel Prods., Inc.*, 304 Md. 67 (1985), we conclude that genuine disputes of material fact precluded a determination of whether Rite Aid was the Mitchells' employer on summary judgment. Specifically, we observe that the prospect that Rite Aid maintained ultimate control over its facility and directed Capstone's supervisors on the services to be provided is not necessarily inconsistent with the possibility that the Mitchells remained employees of an independent contractor free from Rite Aid's control, except as to the final product of their work.

We affirm, however, the circuit court's alternative grant of summary judgment in favor of Rite Aid on the Mitchells' premises liability claim because the Mitchells failed to

IV.     Did the Court err when it failed to find that Appellee Abacus knew or should have known of Moseley's impending violent breakdown?

V.      Did the Court err when it failed to recognize that the negligence of Appellee Abacus was the legal and proximate cause of [Appellants'] injuries?"

3

present any admissible evidence establishing that Moseley's tragic shooting spree was foreseeable. On the element of duty, the Mitchells did not establish that Moseley's attack was a reasonably foreseeable criminal act because (a) there was no history of violent criminal activity in the vicinity of the facility, (b) there was no indication that Moseley posed a threat of violence, and (c) the events immediately preceding the shootings did not presage any imminent violent outburst. Additionally, on the element of causation, the Mitchells failed to identify a causal link between the alleged breaches of duty and the Mitchells' injuries because the evidence established that Moseley would have gained access to the building with her ID badge regardless of the extra security measures suggested by the Mitchells.

Finally, we conclude that the circuit court did not err in granting Abacus's motion for summary judgment on the Mitchells' negligent hiring and supervision claim because they failed to produce any evidence that Abacus was on notice of Moseley's violent characteristics.

We caution that this opinion should not be read to suggest that mass shootings are unforeseeable as a matter of law. As grim statistics and the development of the law in our sister states foreshadow, the standards of care surrounding a business owner's duty to protect invitees from gun violence are not static and will continue to evolve in light of "common sense perceptions of the risks created by various conditions and circumstances." *Axelrod v. Cinemark Holdings, Inc.*, 65 F. Supp. 3d 1093, 1100 (D. Colo. 2014) (quoting *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 48 (Colo. 1987)).

## BACKGROUND

On appeal from the grant of summary judgment, we recite the material facts presented in the deposition testimony, affidavits, agreements, reports, and other evidence before the motions court. Later, in our analysis of the case, we view those material facts that remain in dispute between the parties in a light most favorable to the appellants. *Steamfitters Local Union No. 602 v. Erie Ins. Exch. et al.*, 469 Md. 704, 746 (2020) (citation omitted).

### The Tragedy

Snochia Moseley was a temporary worker at the Rite Aid Distribution Center in Aberdeen, Maryland. Prior to September 20, 2018, she had only worked approximately eight shifts at the facility. On that fateful September morning, Moseley reportedly agitated other workers when she cut in front of them to check into work. She then left the facility for a brief period and returned with a handgun.

At approximately 9:00 a.m., Moseley re-entered the Rite Aid Distribution Center's perimeter gate using her access badge. After parking her car, she got out and opened fire on a group of workers congregated outside the building. Moseley proceeded to enter the building through the front entrance and into the break room, where Haissaun and Shyheim were taking their break. Haissaun, a worker at the facility, employed through Capstone Logistics, related that after hearing the shooting begin, he attempted to escape from the break room but was shot in the leg. Still, he was able to run "down the side of the building" and find an exit door to flee from Moseley.

5

Haissaun's brother, Shyheim, was also employed at the facility through Capstone. Shyheim later testified that he was also in the break room when the shooting began, and that after he heard the first shots, he "[got] to the ground" and hid until Moseley ran "out onto the floor." He then ran through the lobby, where he observed one of the shooting victims, before calling 911.

Michael Mitchell, the father of Shyheim and Haissaun, and a senior Capstone employee, was unloading a truck at the facility when the attack began. After hearing the shots, Michael witnessed a stream of people "coming from the break room." Concerned for Shyheim and Haissaun, Michael scrambled to find them and came upon another worker who had been shot in the stomach. Michael then "ran around the front to the initial parking lot" and saw "a body on the ground" before jumping in his car. He was able to find Shyheim eventually in the parking lot and learned shortly after that Haissaun had been shot in the leg. Haissaun received treatment from emergency personnel at the scene and was transported to the hospital after losing a substantial amount of blood from the gunshot wound.

Moseley's deadly assault occurred within a span of five minutes. Harford County Sheriff's Office deputies, Maryland State Police, and EMS personnel began responding to the active shooter situation at 9:11 a.m., but by that time six victims had been shot by Moseley, three of whom ultimately died. Moseley was found at the scene by Harford County law enforcement officers with a self-inflicted gunshot wound to the head.

Once the scene was secured, Harford County detectives spoke with Chris Fisher, a manager employed by Rite Aid. Mr. Fisher explained that Moseley was "a current

6

employee with Abacus Staffing, a temporary employee agency that provided additional staffing" and detectives learned that she had been working as a temporary employee at the Rite Aid facility for about two weeks. Mr. Fisher noted that Moseley had trouble getting to work and staying for mandatory overtime. He also mentioned that, on the morning in question, it was reported that Moseley had "cut in front of someone" in the line to clock in for the day "so that she would not be late." Because several other employees had also cut in line before, Mr. Fisher addressed the issue at Rite Aid's daily morning meeting.

Another employee, Liteya Head, also told Officer Robert Royster that Moseley cut in front of her and several other employees that morning. Ms. Head said that she did not notice anything otherwise unusual about Moseley and advised that Moseley was a "loner" and "did not speak to people often." The detectives reported that "most of the employees did not know Moseley's name because she was so new." In his deposition testimony, Haissaun described her as being "quiet" and keeping to herself. However, Haissaun did recount rumors that Moseley had tension with a few of her coworkers. Haissaun explained that "I've heard her [sic] and somebody else had problems and she – that pretty much she was getting made fun of for her sexuality." In a statement to detectives, another employee referred to Moseley derisively by using a homophobic slur.

Later on the evening of the shooting, Detectives Tammy Burns and Dave Skica interviewed Moseley's domestic partner, whose car Moseley had driven to the Rite Aid facility on the day of the shooting. According to the Harford County Sheriff's incident

7

report, after the police obtained a warrant, they searched the vehicle and found a "Disciplinary Action Form for Snochia Mosel[e]y."[5]

Moseley's domestic partner told the detectives that Moseley was "bi-polar, schizophrenic so she does have episodes" during which Moseley "gets a little crazy . . . like violent a little bit." She noted that Moseley suffered from jealous delusions and threatened her in the past, on one occasion with a gun. Although Moseley's domestic partner opined that Moseley was generally doing well during the weeks leading up to the shootings, she also observed that Moseley was having monetary issues and was using her car because of problems with the tags on Moseley's vehicle. A case search later confirmed that Moseley had been charged with a series of traffic infractions which led to the suspension of her registration for displaying expired plates.

### The Mitchells' Suit Against Rite Aid and Abacus

The Mitchells filed suit against Rite Aid in the Circuit Court for Baltimore County, after they each received workers' compensation awards in their claims filed against Capstone. In their complaint, the Mitchells alleged that they suffered physical and mental injuries as a result of Rite Aid's negligence. In Count I, the Mitchells alleged that Rite Aid breached its duty of "providing adequate protection for the workers" at its distribution facility "by negligently failing to staff adequate security personnel." In Count II, the Mitchells alleged that Moseley was "an agent, servant, or employee" of Rite Aid and that

---

[5] This form, however, was never produced during discovery. At oral argument, counsel for the Mitchells confirmed that the alleged disciplinary form was not in the record. Recording of Oral Argument, December 12, 2022, at 43:48-43:58.

Rite Aid breached its duty "to provide a safe work environment" by negligently hiring and supervising Moseley.[6]

On January 30, 2020, the Mitchells amended their complaint to add Abacus, Moseley's primary employer, as a defendant. Abacus filed an answer to the amended complaint generally denying "each and every Count." After the circuit court denied Rite Aid's motion to dismiss, Rite Aid filed an answer to the Mitchells' amended complaint and the parties proceeded with discovery.

**Rite Aid's Security Measures**

The Mitchells took the deposition of Robert Oberosler, Rite Aid's corporate designee, to ascertain the security procedures in place at Rite Aid's Aberdeen facility. At the time, Mr. Oberosler was Rite Aid's vice president of asset protection. During the course of his testimony, Mr. Oberosler explained that the Aberdeen facility was composed of two buildings, "the main building and then this satellite," the Liberty Building, where the shootings took place. Mr. Oberosler noted that the Liberty Building "has better exterior security because the entire quadrant of that building that we rented had a fenced enclosure that had an automatic gate" and the "entire parking lot and the building were secured" by the fence. Thus, the building was protected by two layers of access controls, one at the front gate and another at the front door, limiting access to those with an ID badge.

---

[6] The Mitchells later abandoned their claim against Rite Aid under the second count. In their reply to Rite Aid's and Abacus's respective motions for summary judgment, the Mitchells "concede[ed] that Mos[e]ley was not an employee of Rite Aid, and therefore Rite Aid [was] not liable for negligently hiring, retaining, and supervising Mos[e]ley."

Mr. Oberosler stated that, as a whole, the Aberdeen facility had around 30 or 31 security guards on staff, all of whom were uniformed but unarmed. While the main building operated on a 24-hour shift with assigned guards at all times, there were assigned "guards randomly in the Liberty building based off of need[.]" Mr. Oberosler explained that guards were not regularly posted at the Liberty Building because it was fully enclosed with a "double layer of security." On any given shift, there would be approximately four or five security guards deployed throughout the facility, with at least one guard stationed at the entrance to the main building and another at the guard shack in the main facility's tractor trailer yard. Occasionally, a guard would be posted at the front desk of the Liberty building, but otherwise the building was monitored through random patrols. Mr. Oberosler was unaware of any guard being stationed at the entrance to the Liberty building on the morning of the shootings and Haissaun confirmed that there were no guards at the entrance to the building on that day.

In a twist of fate, Mr. Oberosler noted that, shortly before the shootings, he had directed security at the facility to "conduct active assailant training in the building for both security and for managers." Mr. Oberosler explained that he "was watching what was happening throughout the United States in these mass killings" and that there was "a movement of these events into manufacturing type buildings[,]" though there were no preceding events "in and around Aberdeen" which concerned him. Mr. Oberosler directed management-level employees to have some form of active assailant training while he developed a "corporate-wide training that would then incorporate the best practices[.]" Mr. Oberosler explained that the company needed time to develop a training program because

"there wasn't [sic] a lot of people in retail . . . having in place active assailant events for distribution centers and warehouses[.]"

In response to Mr. Oberosler's testimony, the Mitchells tendered Michael Gerard as an expert in the field of security operations. During his deposition, Mr. Gerard opined that Rite Aid: (1) "failed to conduct a threat risk and vulnerability assessment of their facility"; (2) "failed to put any planning measures in place pertaining to armed assailants or violence in the facility"; and (3) "failed to conduct any training or communicate any type of plan or need to their employees." In Mr. Gerard's view, the relevant industry standard required Rite Aid to provide "reasonable and adequate" security at its distribution center. He emphasized that, "the proper way to determine reasonable security is to conduct a security assessment," but that he was not able to expound on the exact measures which Rite Aid needed to have in place because he had not conducted an assessment himself. Mr. Gerard conceded that there was no industry standard requiring security guards to be posted at the front entrance all times.

Nonetheless, based on his conclusion that video evidence showed the second layer of access control to the front door of the Liberty Building was malfunctioning, he opined that "[Rite Aid] should have put a security guard there to ensure that the access control was upheld[.]" Although he acknowledged that Moseley, as a worker with an ID badge, would have gained entrance regardless, Mr. Gerard stressed that "the security guard could have very likely been a deterrent" even if unarmed. In Mr. Gerard's view, a guard could have provided "notice to people in the building, assisting them to evacuate or shelter in place." Mr. Gerard concluded that the presence of a security guard in the Liberty Building

11

"would've played a role in preventing the number of people shot"; but he also made the following concession on cross examination:

> DEFENSE COUNSEL: If the [unarmed] security guard had encountered the shooter, do you have any reason to believe that the security guard would not have been shot, injured and/or killed?
>
> MR. GERARD:   No.

Mr. Gerard explained that, in his view, the "appropriate standard of care" for a business such as Rite Aid required the implementation of an active shooter policy.  He opined that employees at the distribution center should have received training on "how to respond, alternatives such as to evacuate or shelter in place, places where employees . . . could go to during an act of violence[.]"  Mr. Gerard contended that such a training should have been offered "as new employees arrive" and "[a]t least yearly for everyone, as the responses evolve or the threat to a particular facility evolves."

Toward the end of his deposition testimony, Mr. Gerard made a series of concessions regarding the link between the shootings and the security shortcomings that he identified in the following colloquy with Rite Aid's counsel:

> [RITE AID COUNSEL:] Can we agree that even if the best training and active shooter drills were employed at this Liberty facility prior to the date of the incident, that training and drills, in and of themselves, may not have prevented what occurred from occurring, correct?
>
> [MR. GERARD:] Correct.
>
> [RITE AID COUNSEL:] In other words, even if Rite Aid did everything correct, in your opinion, you can't say that this incident would not have occurred, or people would not have been injured or killed. There is no way to do that because it's speculative, correct?
>
> [MR. GERARD:] Correct.

12

* * *

[RITE AID COUNSEL:] And you would agree with me that even if the access system on the main door was operating a hundred percent properly on the day of the incident, the shooter would still have been able to gain access to the building by using her access card, correct?

[MR. GERARD:] Correct.

* * *

[RITE AID COUNSEL:] Can we agree that if the access door had been working by that day, there was no requirement by industry standards to have a security guard on site?

[MR. GERARD:] Correct.[7]

**Rite Aid and Abacus Are Granted Summary Judgment**

On November 9, 2021, Rite Aid moved for summary judgment. Citing subtitle 5 of the Maryland Workers' Compensation Act, Rite Aid argued that "[i]t is axiomatic that an employee's exclusive remedy for a workplace injury against their employer is through a workers' compensation claim." According to Rite Aid, the Mitchells' tort claims were barred because the Mitchells were "temporary employees under the control of Rite Aid," and therefore, Rite Aid was entitled to workers' compensation immunity. Pointing to the Supreme Court of Maryland's[8] decision in *Whitehead v. Safway Steel Prods., Inc.*, 304 Md.

_____

[7] Rite Aid and Abacus filed a joint motion to strike Mr. Gerard's testimony, arguing that during his deposition "it became patently obvious that he lacked the requisite qualifications to testify as an expert in this case and that his 'because I say so' opinions do not comport with Maryland law." The defendants' joint motion was dismissed as moot by the circuit court on January 11, 2022, "in light of the court's grant of Defendants' Motions for Summary Judgment."

[8] In the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

67 (1985), Rite Aid argued that, as in *Whitehead*, it exercised control over the Mitchells' work at its facility even though they were temporary workers provided by Capstone. Specifically, in its motion, Rite Aid stressed that "[Rite Aid], at its sole discretion, retained the right to remove Capstone's employees, without prior notice, at any time, for any reason" and that both Shyheim and Haissaun "acknowledged that, ultimately, they were subject to [Rite Aid's] control[.]"

In the alternative, Rite Aid contended that it was entitled to judgment because the Mitchells could not assert either a premises liability claim or a negligent hiring claim since there was no "causal nexus between [Rite Aid']s actions and the random shooting incident[.]" More specifically, Rite Aid asserted that Mr. Gerard could not "state within a reasonable degree of certainty [that] the alleged negligence of [Rite Aid] caused Plaintiffs' damages[,]" and therefore, Mr. Gerard conceded a lack of "but-for" causation. With respect to foreseeability, Rite Aid posited that there was "no prior history of criminal conduct at [Rite Aid's] distribution center" or "history of prior employee threats" that would have put Rite Aid on notice of a need for additional security measures.

Abacus also moved for summary judgment, arguing that "[i]t is clear from the undisputed facts that the shooting of September 20, 2018 was unforeseeable" and that "[the Mitchells'] claim of negligent hiring, supervision and retention fail[s] as a matter of law." Abacus emphasized in its motion that it acted with reasonable care in conducting a state and federal criminal background check and drug screening, which revealed no prior criminal convictions or use of illegal substances on the part of Moseley. Abacus also noted

that "[d]uring her short tenure with Abacus, Moseley had no disciplinary actions taken against her and no reports of misconduct."

In their opposition to the motions for summary judgment, filed on November 29, 2021, the Mitchells insisted that they were solely employees of Capstone, which "set its employee's schedules, required employees to wear distinctive orange vests unlike other warehouse workers, did not require employees to attend morning meetings facilitated by Rite Aid, trained employees to use a specific method of breaking down a truck, and gave employees the freedom to choose to ignore or perform suggestions made by Rite Aid management." Countering Rite Aid's arguments on the premises liability claim, the Mitchells reiterated that they were business invitees, and therefore "Rite Aid owed [them] a duty to provide competent security personnel and security measures so as to minimize potential threats of harm" and Rite Aid failed to comply with that duty by failing to station a guard at the front entrance to the Liberty Building. In response to Abacus's justifications for hiring Moseley, the Mitchells asserted that Abacus failed to speak with Moseley's past employers, "which would have easily revealed her recent firing due to a physical altercation [with] another employee."[9]

---

[9] This assertion apparently stemmed from a statement by Moseley's domestic partner contained within the Harford County Sheriff's Report. She asserted that Moseley had purportedly been fired from a previous job because "she got in a fight." There was no other evidence of this alleged termination in the record nor any indication whether the "fight" referred to physical violence or a heated verbal exchange and the corporate designee for Abacus stated that the company had no knowledge of any such incident. The trial court therefore appeared to disregard this isolated statement as inadmissible hearsay, and the Mitchells failed to argue that any exception applied.

15

A hearing on the motions for summary judgment was held before the circuit court on January 10, 2022. After hearing argument from the parties, the court granted each of the motions for summary judgment in an oral ruling from the bench. With respect to Rite Aid's motion, the court explained:

> [T]he Court is satisfied that this is a matter where workers' compensation immunity applies. And the reasons for that, I find that there's no genuine dispute as to a material fact. And the Defendant Rite Aid is entitled to summary judgment as a matter of law because I have reviewed the deposition testimony of the [Mitchells] and other witnesses.
>
> * * *
>
> . . . The testimony that was offered in support of Defendant's Motion for Summary Judgment indicates that the three [Mitchells] were working at the direction, control and supervision of Rite Aid's supervisors.
>
> Rite Aid had ultimate discipline and firing authority. The [Mitchells] worked at Rite Aid's distribution center, and they were performing duties, not only at Rite Aid's direction, but for Rite Aid's benefit. Rite Aid's contract, as I alluded to a moment ago, makes clear that what Rite Aid was paying Capstone, was to cover not only the wages for the [Mitchells], but also to cover workers' compensation insurance that would protect both Capstone and Rite Aid.
>
> I mean, that is expressly provided for in the written agreement, which was attached in support of the Defendant's Motion for Summary Judgment. I also note that, . . . the [Mitchells] successfully filed workers' compensation claims arising out of this incident, which forms the basis of the lawsuit.
>
> And so, it is for those reasons that the Court is satisfied that workers' compensation immunity applies in this case and, therefore, the [Mitchells] are barred from filing, or pursuing this lawsuit.

With respect to the Mitchells' alternative premises liability claim, the court determined that the Mitchells could not establish foreseeability or causation:

> Foreseeability in particular, the Court agrees that this is a case where there's no genuine dispute as to a material fact regarding foreseeability.

16

There was, unlike the case that was cited, no evidence of a gun. I questioned [the Mitchells' counsel] in detail about that because he said that there was some evidence that there were threats of violence before the shooter, Ms. Mos[e]ley, left and returned to the premises.

There's just no admissible evidence of that. Then, there, there are no security persons who have weapons, or had weapons, at the time. It is correct that because Ms. Mos[e]ley was an [Abacus] employee, she had access to the property. So, even if there was a malfunction with getting in and out, she would have still had access.

The entire incident, as I understand it, and there doesn't seem to be a dispute about it, from the time she pulled out the Glock weapon, shot someone outside the actual front door, and then entered and continued to fire, all of that happened within a period of five minutes or less.

There's no evidence that has been offered at this stage, to show that there were, no admissible evidence, that there were prior threats of violence. Nothing to put Rite Aid on notice and so, it is for all of those reasons the Court finds that the Defendant Rite Aid's Motion for Summary Judgment should be granted.

Then, turning to Abacus's motion, the court first granted the motion on Count I—the premises liability count—because the "responsibility for security at the premises was not that of the temporary employer, of Abacus." Next, the court granted the motion on Count II—the negligent hiring count—explaining:

The undisputed evidence shows that the Defendant, Abacus, conducted a State and Federal criminal background check, they conducted a drug screen, which [sic] resulted in no positive urines, no positive indication that she had a substance abuse issue.

There has been argument made she had some routine traffic citations relating to registration of her vehicle and that she had a tax lien at some point which was dismissed. Even if that were true, I don't see how that would put the employer, Abacus, on notice that she was some type of violent threat.

\* \* \*

17

We've heard about these purported statements on the day of the shooting. But again, there's no admissible evidence, no affidavits, no deposition testimony, nothing that supports a claim that she made these threats to go get a gun or that she made a threat that she was going to leave and come back and kill people.

There's no admissible evidence of that. And without there being admissible evidence, then there isn't a genuine dispute on that point. The corporate designees, as Defense counsel pointed out, were deposed. Her record of employment, there's no indication that she did receive a citation.

I know that [Plaintiffs' counsel] has referenced that, that there was a citation found by a sheriff's deputy after they searched Ms. Mosel[e]y's vehicle following the shooting. But it's never been produced during discovery and, as I say, the corporate designee was asked about it and there was no negative information in Ms. Mosel[e]y's brief employment file. I say brief because she only worked approximately eight shifts before this unfortunate shooting occurred.

The specific allegations, I made a point to read into the record regarding count two. I . . . don't see any evidence that's been offered in opposition to the Motion for Summary Judgment that would have put the Defendant, Abacus, on notice about Ms. Mosel[e]y's alleged mental instability. Anything that they were aware of or should have been aware of, that made her a dangerous and/or an unfit employee, that showed that she or suggested that she was mentally unstable.

On January 11, 2022, the circuit court entered corresponding orders granting Rite Aid's and Abacus's respective motions for summary judgment. Thereafter, the Mitchells filed a timely motion for reconsideration, which the court denied in an order entered on February 16, 2022. The Mitchells noted an appeal to this Court on March 3, 2022.

We will supplement the background facts in our discussion of the issues.

18

## DISCUSSION

## I.

## Workers' Compensation Immunity

Our discussion begins with the Mitchells' challenge to the grant of summary judgment in favor of Rite Aid on the ground that the Mitchells, as employees of Rite Aid, were barred by the Workers' Compensation Act from filing the underlying negligence claims. In a similar case, *Great Atlantic & Pacific Tea Co., Inc. v. Imbraguglio*, the Supreme Court of Maryland also considered a trial court's grant of summary judgment on the issue of employer status under the Workers' Compensation Act. 346 Md. 573 (1997). The Court observed that,

> [o]rdinarily, the existence of the employer/employee relationship is a question reserved for the fact finder. *Mackall v. Zayre Corp.,* 293 Md. 221, 230, 443 A.2d 98, 103 (1982). When, however, the existence of the relationship is undisputed, or the evidence on the issue is uncontroverted, unless conflicting inferences can be drawn from that evidence, the trial court is entitled to treat the matter as a question of law. *Whitehead v. Safway Steel Products,* 304 Md. 67, 76 (1985).

*Id.* at 590 (cleaned up). Successively, our review of a trial court's grant of summary judgment requires that we examine the record to determine whether "there is no genuine dispute as to any material fact," and whether the trial court was legally correct in deciding that the moving party was entitled to judgment as a matter of law. Md. Rule 2-501(a). We view the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party. *Steamfitters Local Union No. 602 v. Erie Ins. Exch. et al.*, 469 Md. 704,746 (2020).

19

The Mitchells contend that Rite Aid is a third-party tortfeasor rather than their employer and that Rite Aid was not entitled to workers' compensation immunity. They lean on Michael's deposition testimony in asserting that, as Capstone employees, they had "the freedom to choose to ignore or perform suggestions made by Rite Aid management" because Capstone had "a specific method of breaking down trucks[.]" The Mitchells also stress that "Rite Aid could not dictate payment of [their] wages nor terminate their employment" as these powers were solely the domain of Capstone. Finally, they refer to Section 5.1 of Capstone's contract with Rite Aid, which provides that "[n]othing contained herein shall be construed as implying that employees of either Party are employees of the other Party for any purpose whatsoever, including, without limitation, participation in the benefits and privileges given or extended by such other Party to its employees."

Rite Aid counters that it maintained control over the Mitchells' performance of their daily tasks and, therefore, we must regard Rite Aid as the Mitchells' employer under the test set forth in *Whitehead v. Safway Steel Prods., Inc.*, 304 Md. 67 (1985). Rite Aid stresses that *Whitehead* is dispositive of this appeal because the Mitchells, much like the employee in *Whitehead*, were subject to its control while they were "unloading and packing [Rite Aid's] merchandise." Rite Aid further emphasizes that the Mitchells "do not, and cannot, refute the express terms of the contract[,]" which provided that Rite Aid had the authority to "remove any [Capstone] employee at any time for any reason from its facilities."

As a predicate to our analysis of the parties' contentions, we review the evidence in the record pertaining to the employment relationship between the parties and then turn to the legal framework that governs our resolution of the issue.

### A. *The Master Purchase Agreement and Control Over Employees*

The "Master Purchase Agreement" between Rite Aid and Capstone in effect at the time of the incident provided that Capstone employees would perform truck unloading services for Rite Aid at its Aberdeen facility. Section 2.6 of the agreement stated that "[Capstone] must provide all supervision, quality control programs, inspections, or verifications required to ensure compliance with this Agreement"; and under Section 3.3, Rite Aid agreed to pay invoices for services provided by Capstone within 30 days of receipt.

Section 5.1 of the agreement provided that "Rite Aid and [Capstone] are and shall remain independent contractors, and none of the provisions in this Agreement shall be construed to create a partnership or joint venture between the parties." Further, each party was to "remain solely responsible for wages, hours, taxes, tax withholdings, and all other conditions of employment of its own personnel" during the term of the agreement. Significantly, the agreement emphasized in Section 5.1 that "[n]othing contained herein shall be construed as implying that employees of either Party are employees of the other Party for any purpose whatsoever, including, without limitation, participation in the benefits and privileges given or extended by such other Party to its employees."

The agreement imposed upon Capstone the sole responsibility to "purchase and maintain such insurance as will protect [Capstone] and Rite Aid" for, among other potential

21

liabilities, "claims under workers' or workmen's compensation" in Section 6.7. Additionally, Capstone was obligated to provide Rite Aid certificates of insurance showing "that all of the insurance required by Paragraph 6.7 (other than workmen's compensation insurance) identifies Rite Aid as an Additional Insured."

Section 6.17 of the agreement provided that Capstone would select the employees to work at the Rite Aid facility and that "Rite Aid will not provide guidance in the decision-making process regarding [Capstone] employees." Section 6.17 required, however, that Capstone "keep the safety and security of [Rite Aid's] associates and merchandise as a top priority when making a business decision regarding the type of employee [Capstone] would hire[.]"

Section 6.19 delineated Rite Aid's oversight of Capstone's work. Specifically, Rite Aid was to "notify [Capstone] if, in Rite Aid's sole discretion, any internal problems and/or incidents regarding [Capstone's] employees and their dissatisfaction with [Capstone's] Management, policies or procedures that could interfere with the continued safe and efficient operations at any Rite Aid site[.]" Rite Aid retained the discretion to "remove any [Capstone] employee at any time for any reason from its facilities" and "[i]n the event Rite Aid [wa]s dissatisfied [with the] conduct of any [Capstone] employee, Rite Aid [could] require [Capstone] to remove such employee from its roster of employees working at Rite Aid facilities." Finally, pursuant to Section 6.20, Capstone was required to "identify their employees with either a unique colored T-shirt, vest, hat or other visibly distinguishable feature" which must "be worn by all [Capstone] employees while on the site."

In his deposition testimony, Rite Aid's corporate designee expounded on the work that Capstone employees performed for Rite Aid at the Aberdeen facility. He explained that Capstone was "known for [being] unloaders of [] inbound freight" and that they helped Rite Aid perform day-to-day operations such as "picking, selecting orders, staging orders at the outbound." Mr. Oberosler also asserted that Capstone workers would "get their directive from the managers, the supervisors at Rite Aid" on what tasks to perform and that Rite Aid, if unhappy with the performance of any Capstone worker, could "[e]scort them to the door and tell [Capstone] to not have them return."

Shyheim and Haissaun, in their depositions, evinced a slightly different understanding from Mr. Oberosler's regarding to whom they reported. Haissaun explained that his schedule was set by the on-site supervisors for Capstone, who normally gave him his tasks for the day. Shyheim similarly noted that Capstone supervisors, Harry and Carla, would give directions to Michael, who would then relay those instructions to Capstone workers. Both Haissaun and Shyheim, however, confirmed that Rite Aid management retained the ultimate responsibility for assigning tasks to Capstone workers. As Haissaun put it, "it's just like a chain, you know . . . big boss at the Rite Aid tells Harry and Carla what they need done . . . [a]nd Carla goes and tells my father, . . . a supervisor, you know, of the workers there, okay, we need this specific thing done."

Michael testified to sharper distinctions in the chain of command. He asserted that, as a supervisor for Capstone, he only took direction from Capstone's on-site supervisors about the tasks to be completed on any given day. Although he noted that Capstone worked for the benefit of Rite Aid, Michael reemphasized that Capstone had "their own way of

23

breaking down the truck" which he called "the Capstone process." Rite Aid management

personnel could "make a suggestion" about how to unload a truck, but, Michael claimed,

he would not take those directions without first clearing the matter with his supervisors at

Capstone. In the same vein, Haissaun confirmed that Capstone workers wore distinctive

orange vests and did not participate in morning meetings with other Rite Aid workers.

### B.  Legal Framework

Under Section 9-509 of the Maryland Workers' Compensation Act which is codified

in Title 9 of the Maryland Code (1991, 2016 Repl. Vol., 2021 Supp.), Labor & Employment

Article ("LE"), the liability of an employer for injuries to an employee while on the job is

exclusive to a claim in workers' compensation, save for two exceptions not relevant to this

appeal.[10] The exclusivity provisions of the statute read as follows:

> (a) *Employers.*—Except as otherwise provided in this title, the liability of
> an employer under this title is exclusive.
>
> (b) *Covered employees and dependents.*—Except as otherwise provided in
> this title, the compensation provided under this title to a covered employee
> or the dependents of a covered employee is in place of any right of action
> against any person.

LE § 9-509 (a)-(b).

Section 9-509 "vindicates an essential and basic tenet of workers' compensation

law—limited employer liability." *Great Atl. & Pac. Tea Co., Inc. v. Imbraguglio*, 346 Md.

---

[10] The two exceptions to the rule barring covered employees from maintaining a right of action against their employer deal with the failure by the employer to secure compensation, LE § 9-509(c), and when an employee is killed or injured as a result of deliberate acts by the employer. LE § 9-509(d).

573, 582 (1997). At its core, this tenet effectuates a compromise in which, in exchange for forfeiting their rights to bring an action in tort, employees "are provided the prospect of swift and sure compensation, without regard to fault, under other provisions of the Act." *Id.* Consequently, under this framework, employees "abandon common law remedies" and are limited to the sole remedy of a workers' compensation claim against their employers for injuries sustained in the course of their employment. *Polomski v. Mayor & Cty. Council of Balt.*, 344 Md. 70, 77 (1996) (citing *Belcher v. T. Rowe Price*, 329 Md. 709, 736 (1993)) (footnote omitted).

On the other hand, the Workers' Compensation Act does not prevent "covered employees" from maintaining an action against a culpable third-party tortfeasor. According to LE § 9-902, once a covered employee has been awarded compensation for injuries sustained,[11] then, initially, "a self-insured employer, an insurer, [the] Subsequent Injury Fund, or [the] Uninsured Employers' Fund" has the option to bring an action for damages against the third party who is liable for the injury or death of the covered employee. LE § 9-902(a). However, if "the self-insured employer, insurer, Subsequent Injury Fund, or Uninsured Employers' Fund does not bring an action against the third party within 2 months after the Commission makes an award, the covered employee or, in case

_____

[11] The Act provides that "each employer of a covered employee shall provide compensation in accordance with this title to[ ] the covered employee for an accidental personal injury sustained by the covered employee[.]" LE § 9-501(a)(1). An "accidental personal injury" is defined as one which "arises out of and in the course of employment[,]" LE § 9-101(b)(1); "an injury caused by a willful or negligent act of a third person directed against a covered employee in the course of the employment of the covered employee[,]" LE § 9-101(b)(2); or, "a disease or infection that naturally results from an accidental injury that arises out of and in the course of employment[.]" LE § 9-101(b)(3).

25

of death, the dependents of the covered employee may bring an action for damages against the third party." LE § 9-902(c). An individual, pursuant to LE § 9-202, is "presumed to be a covered employee while in the service of an employer under an express or implied contract of apprenticeship or hire[,]"—a presumption that is rebutted by a showing "that the individual performing services is an independent contractor in accordance with the common law or is specifically exempted from covered employment under this subtitle." LE § 9-202(a), (c).

Because the Mitchells were undoubtedly "covered employees" of Capstone—and in fact received workers' compensation awards from Capstone—the inquiry becomes whether the Mitchells, as covered employees, had the right to bring a tort action against Rite Aid as a third-party tortfeasor after Capstone had failed to do so. In other words, the issue in this appeal boils down to whether Rite Aid was also an employer of the Mitchells.

As the Maryland Supreme Court observed three decades ago in *Imbraguglio*, "[t]hat an employee can concurrently serve two employers is not a novel concept in Maryland law." *Imbraguglio*, 346 Md. at 591. The existence of an employer-employee relationship is determined by considering "(1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer." *Whitehead v. Safway Steel Prods., Inc.*, 304 Md. 67, 77-78 (1985) (citing *Mackall v. Zayre Corp.*, 293 Md. 221, 230 (1982)). Although all five factors are considered, Maryland law is clear that "the factor of control stands out as the most important." *Id.* at 78. In fact, our Supreme Court has previously described the factor of control as the "decisive," *see*

26

*Mackall*, 293 Md. at 230, and "controlling" inquiry. *See L.&S. Constr. Co. v. State Accident Fund*, 221 Md. 51, 57 (1959).

In *Whitehead*, the Supreme Court of Maryland considered whether a person who was employed by a temporary services agency was also an employee of the business to which the worker was temporarily assigned. *Whitehead*, 304 Md. at 70. The undisputed facts before the Court were that Whitehead worked for Bay Services, an agency "in the business of supplying unskilled labor to various industrial customers." *Id.* Upon request, Bay Services would send temporary workers to the client, who would be responsible for "record[ing] the number of hours worked by the employee and bill[ing] accordingly." *Id.* Bay Services would then pay the worker "a designated wage and maintain[] workmen's compensation insurance to cover any unforeseen mishaps." *Id.* Whitehead was sent to Safway as a temporary worker and was severely injured by a falling bundle of scaffolding. *Id.* at 71.

After Whitehead filed for, and received, workers' compensation benefits from Bay Services for his injury, he sued Safway for the negligent operation of its plant and the case proceeded to trial. At the close of Whitehead's case, Safway's motion for a directed verdict was denied by the court and the case was submitted to the jury without Safway presenting evidence. *Id.* The jury found in favor of Whitehead and awarded damages. *Id*. at 71. Safway then moved for a judgment notwithstanding the verdict. *Id.* The trial court granted the motion because the "uncontradicted evidence demonstrated that Safway controlled Whitehead's work" and "his only remedy for the occupational injury was through the

27

workmen's compensation laws." *Id.* The Supreme Court of Maryland granted *certiorari* before consideration of Whitehead's appeal in this Court and affirmed. *Id.* at 71-72.

Before the Supreme Court, Safway argued that the employer/employee relationship at issue in the case was properly treated as a legal question because there were no facts in dispute—all of the facts presented at trial were presented by Whitehead and the defense rested without calling a witness. *Id.* at 72. The Court reviewed precedent establishing that "[*i*]*f there is evidence to support an inference that more than one individual or company controls or directs a person in the performance of a given function, the question whether an employer-employee relationship exists is a question of fact to be determined by a jury*." *Id.* at 76 (emphasis added) (quoting *Mackall*, 293 Md. at 230). Applying this precedent, the Court underscored that "whenever evidence in a labor case is disputed, *and* differing inferences from the evidence are possible, a jury must determine the underlying employment issue." *Id.* at 76 (emphasis in original). The court instructed that "the trial court should take some pains to ensure that conflicting inferences are not possible on the presented evidence," and clarified that "a party must point to *evidence* in the case that control of a given function is vested in more than one person." *Id.* (emphasis in original) (internal citations omitted).

After applying the five-factor test for determining an employer/employee relationship, the Court concluded that judgment in favor of Safway was proper considering the control that Safway exercised over Whitehead. *Id.* at 79. In fact, Whitehead himself "concede[d] that all control of specific tasks while he was at Safway belonged entirely to Safway." *Id.* at 76. Specifically, the Court emphasized that "Safway instructed Whitehead

28

on the task to be performed, supervised his work, and was free to reassign him to any other duties that warranted attention." *Id.* at 79. Further, if dissatisfied with the quality of Whitehead's work, "Safway was free to dismiss him and request an additional worker." *Id.* Finally, the Court noted that "the amount Safway was billed by Bay Services for its use of the temporary worker was greater than what Bay paid Whitehead" so as to cover "Bay [Services]'s payment of Whitehead's unemployment and workmen's compensation insurance." *Whitehead*, 304 Md. at 79. Consequently, with Safway's control over Whitehead firmly demonstrated by uncontradicted evidence, judgment was proper because Whitehead was simultaneously an employee of both Bay Services and Safway. *Id.*

In a case factually closer to the present case, *Great Atlantic & Pacific Tea Co., Inc. v. Imbraguglio*, the evidence presented a complex question as to the level of control that parent entities of the decedent's direct employer exercised over his work. 346 Md. 573 (1997). There, the Supreme Court of Maryland held that a parent company was not entitled to summary judgment on the basis of workers' compensation immunity. *Id.* at 579. Salvatore Imbraguglio died from injuries sustained in an accident in a warehouse that was owned by the Great Atlantic and Pacific Tea Company Inc. ("A & P"), but managed by employees of Super Fresh Markets of Maryland Inc ("Super Fresh"), another distinct corporate entity that was a wholly owned subsidiary of A & P. *Id.* At the time, Mr. Imbraguglio was working as a forklift operator for Supermarket Distribution Services, Inc. ("SDS"), "another corporate entity distinct from, but wholly owned subsidiary of, A & P." *Id.* The respondent, Mr. Imbraguglio's widow, received a workers' compensation award

29

against the decedent's direct employer, SDS, while A & P, as the workers' compensation insurer for SDS, paid all workers' compensation benefits. *Id.* at 580 (footnote omitted).

Mrs. Imbraguglio filed suit against both A & P and Super Fresh on a premises liability theory. Each defendant moved for summary judgment. *Id.* A & P argued that it was immune from tort liability as the workers' compensation insurer for SDS and Super Fresh, and Super Fresh argued that it was Mr. Imbraguglio's statutory employer. *Imbraguglio*, 346 Md. at 580. The circuit court granted the respective motions after finding that A & P and Super Fresh "were the decedent's consolidated employers and therefore entitled to tort immunity under the exclusivity provisions of the Act." *Id.* We reversed, and the Maryland Supreme Court affirmed, directing a remand so that Mrs. Imbraguglio's claims could proceed. *Id.* at 580-81, 599.

With regard to A & P, the Court held that LE § 9-509 did not bar an injured employee from maintaining an action in tort against a workers' compensation insurer for injury caused by the insurer's negligent maintenance of property that it owns. *Id.* at 578. The Court distinguished precedent holding that an insurer is immune from tort liability when it performs a duty imposed on the employer by the Workers' Compensation Act, by pointing out that "A & P is charged with negligence in its capacity as a property owner, not as a workers' compensation insurer or for any acts it undertook pursuant to that role." *Id.* at 587-88. The Court also observed that under LE § 9-902,[12] an insurer "is entitled to

---

offset any judgment entered against it for amounts already paid pursuant to its obligation as the worker's compensation insurer." *Id.* at 589.

Next, the Court held that the trial court erred in granting summary judgment on the basis that Mrs. Imbraguglio's suit against Super Fresh and A & P was barred under LE § 9-509 because they were the decedent's "dual" employers. The Court emphasized that, "[o]rdinarily, the existence of the employer/employee relationship is a question reserved for the fact finder." *Imbraguglio*, 346 Md. at 590 (citing *Mackall*, 293 Md. at 230). Although the Court allowed that summary judgment may be appropriate where the evidence on the issue is uncontroverted, the Court stated that the record was not "sufficient to warrant the trial court's conclusion on summary judgment that the decedent was simultaneously an employee of SDS, Super Fresh, and A & P." *Id.* Ultimately the Court found unpersuasive the contention by A & P and Super Fresh, based on *Whitehead*, that because there was "some measure of control over the decedent's workplace by the Petitioners, *a fortiori,* the decedent was an employee of those who exercised that control."

---

(e) *Distribution of damages.*—If the covered employee or the dependents of the covered employee recover damages, the covered employee or dependents:

    (1) first, may deduct the costs and expenses of the covered employee or dependents in the action;

    (2) next shall reimburse the self-insured employer, insurer, Subsequent Injury Fund, or Uninsured Employers' Fund for:

        (i) the compensation already paid or awarded; and

        (ii) any amounts paid for medical services, funeral expenses, or any other purpose under Subtitle 6 of this title; and

    (3) finally, may keep the balance of the damages recovered.

LE § 9-902(e).

*Id.* at 592. The Court explained that that argument "confuse[d] control of the workplace with control of the worker" and that "[u]nlike the employee in *Whitehead,* there [wa]s no concession from Mrs. Imbraguglio that her husband was in any way controlled by either A & P or Super Fresh, or under their direct managerial authority[.]" *Id.* at 592-93. Consequently, because the record cut both ways on the issue, summary judgment was not appropriate. *Id.* at 593.

Building on the principles established in the foregoing cases, the Supreme Court recently held in *Tyson Farms, Inc. v. Uninsured Employers' Fund*, 471 Md. 386 (2020), that under the evidence presented, a worker's purported status as a dual employee of two different companies was not a matter of law, but rather, a question for a finder of fact. The employee in *Tyson Farms*—Mauro Garcia—contracted a lung disease while working at a farm owned by Dai Nguyen that raised chickens owned by Tyson Farms. *Id.* at 390. Garcia brought a workers' compensation claim against Nguyen and later impleaded Tyson Farms, alleging that it was his co-employer along with Nguyen. *Id.* The Uninsured Employers Fund ("UEF") was brought into the claim because Nguyen was an uninsured employer. *Id.* The Commission issued an award of compensation, finding that both Nguyen and Tyson Farms were co-employers of Garcia at the time he contracted his occupational disease, and that they were, therefore, jointly and severally liable for payment of Garcia's benefits and medical expenses. *Id.* at 392.

Tyson Farms sought judicial review in the Circuit Court for Worcester County and the case proceeded to trial before a jury. *Tyson Farms*, 471 Md. at 392-93. The evidence adduced at trial demonstrated that Nguyen, who had no prior experience in operating a

32

chicken farm, employed Garcia to manage the farm's operations. *Id.* at 394. In contracting with Tyson Farms to raise chickens, Nguyen was expected to operate the farm "using technical advice from Tyson." *Id.* However, a senior manager at Tyson Farms testified that under the standard contract, the company (1) was not involved with hiring or firing workers on partner farms, (2) did not set the hours of workers, and (3) had the right to terminate any agreements with partner farms if certain specifications for raising the chickens were not met. *Id.* In the specific agreements at issue, Nguyen was identified as an independent contractor required to furnish labor and comply with Tyson Farms's best management practices in raising the chickens, which remained the property of Tyson Farms. *Id.* at 395.

Vicky Palmer, another management employee at Tyson Farms, testified that when Nguyen was present at the farm, she would deal directly with him. *Tyson Farms*, 471 Md. at 396-97. However, when Nguyen was absent, Palmer would provide Garcia with guidance as to how to operate the farm. *Id.* at 397. In turn, Garcia testified that he had extensive interactions with Tyson Farms employees, whom he characterized as having taught him "everything" about raising chickens in visits which took place at least two to four times per week. *Id.* at 398. Palmer, however, clarified that although she communicated frequently with Garcia, she did not set his hours, pay him, or have the power to fire him. *Id.* at 397.

Tyson Farms and the UEF moved for judgment as a matter of law at the close of the evidence, and the circuit court denied the motion. *Id.* at 390, 400. The jury returned a verdict in favor of Tyson Farms, finding that it was not Garcia's employer. *Tyson Farms*,

33

471 Md. at 402. On appeal, we reversed the judgment of the circuit court and held that the motion for judgment should have been granted because the only inference that the evidence supported was that Tyson Farms was Garcia's employer. *Id.* at 391, 403. The Maryland Supreme Court reversed, holding that the trial court properly submitted the issue of Tyson Farms' status as an employer to the jury. *Id.* at 391, 427.

In holding that this Court erred in concluding, as a matter of law, that Tyson Farms was Garcia's co-employer, the Supreme Court reaffirmed standing precedent that "where there is evidence supporting 'an inference that more than one individual or company controls or directs a [worker] in the performance of a given [duty], the question of whether an employer-employee relationship exists is a question of fact to be determined by the jury[.]'" *Id.* at 417 (quoting *Mackall v. Zayre Corp.*, 293 Md. 221, 230 (1982)). Although the evidence adduced at trial tended to show that Tyson Farms closely controlled the manner in which the chickens were to be raised by Garcia (as the manager of Nguyen's farm), it also clearly showed that Tyson Farms did not "have the right to hire or fire workers on a farm with whom Tyson [Farms] contracts and Tyson [Farms] does not set the hours for the workers." *Id.* at 421. Therefore, because the evidence could support a finding that Tyson Farms did not manifest significant control over Garcia's employment, the circuit court properly denied the motion for judgment "because the facts and circumstances did not permit only one inference as to the issue of whether Tyson [Farms] was a co-employer of Garcia." *Tyson Farms*, 471 Md. at 419.

*C. Analysis*

In the present case, as in *Tyson Farms*, we remain mindful of the procedural posture of the Mitchells' action against Rite Aid. At the summary judgment stage, if the evidence supports an inference that both Rite Aid and Capstone possessed control over the Mitchells, then "the question of whether an employer-employee relationship exists is a question of fact to be determined by the jury[.]" *Tyson Farms*, 471 Md. at 417 (quoting *Mackall*, 293 Md. at 230). Of course, unlike in *Tyson Farms*, our current task is to determine whether the question of Rite Aid's status as an employer was improperly *kept from*, rather than submitted to, a jury due to the circuit court's grant of summary judgment. Yet, the point remains the same: if the evidence would support a reasonable inference that Rite Aid was *not* the Mitchells' employer, then the issue should have been determined by a jury. In this case, we agree with the Mitchells that the question of Rite Aid's status as an employer should not have been decided on summary judgment.

Rite Aid argues strenuously that the parties cannot "refute the express terms of the contract" in determining whether an employer-employee relationship existed. We agree and yet reach a diametrically opposite result. Certainly, Rite Aid is correct that portions of the agreement support its position that it maintained ultimate control over the Mitchells. For instance, pursuant to Section 6.19, Rite Aid retained the discretion to "remove, without prior notice, all [Capstone] employee[]s at any time from its facilities" and, if Rite Aid was "dissatisfied" with the conduct of any Capstone employee, it could "require [Capstone] to remove such employee from its roster of employees working at Rite Aid facilities." Yet, there are several provisions pointing the other way. Indeed, the Mitchells point to Section

35

5.1 of the agreement, which provides that "[n]othing contained herein shall be construed as implying that employees of either Party are employees of the other Party for any purpose whatsoever, including, without limitation, participation in the benefits or privileges given or extended by such other Party to its employees." Of course, whether an individual is an employee or independent contractor is ultimately a fact-specific inquiry, but we can hardly ignore the express language indicating that Capstone's employees were not employees of Rite Aid.

Other provisions of the agreement similarly support the Mitchells' position that they were solely employees of an independent contractor. For example, Section 6.17 of the agreement provided that Capstone would conduct background investigations and that "Rite Aid will not provide guidance in the decision-making process regarding [Capstone] employees." Likewise, pursuant to Section 6.20, Capstone was required to "identify their employees with either a unique colored T-shirt, vest, hat or other visibly distinguishable feature" which must "be worn by all [Capstone] employees while on the site." Finally, under Section 6.7, although Capstone was required to "purchase and maintain such insurance as will protect [Capstone] and Rite Aid" from "claims under workers' or workmen's compensation," the workers' compensation policy was explicitly excluded from the requirement to identify Rite Aid "as an Additional Insured." To be sure, Rite Aid argues that it paid Capstone a premium rate to partially cover the cost of workers' compensation insurance, but the agreement does not provide for such and Rite Aid cannot point to any evidence in the record to establish that point. Regardless, the contract between

Capstone and Rite Aid, at a minimum, cuts both ways on the question of whether Rite Aid functioned as the Mitchells' co-employer.

Next, Rite Aid asserts that the present case is controlled definitively by *Whitehead*. Although there are some parallels between the cases, we ultimately disagree. This case is distinguishable from *Whitehead* in several key respects. First, the Mitchells presented evidence that they received direction primarily from Capstone's on-site managers, unlike in *Whitehead,* where Whitehead was directly managed by supervisors from the alleged employer, Safway. Michael attested that Capstone had "their own way of breaking down the truck" and that while Rite Aid management could "make suggestions" about how to unload a truck, he would not implement those suggestions without first clearing the matter with his superiors at Capstone. Relatedly, Haissaun described that Capstone workers wore distinctive orange vests, did not participate in morning meetings with Rite Aid workers, and had their schedules set by Capstone's managers. In *Whitehead*, by contrast, the employee-appellant specifically "concede[d] that all control of specific tasks while he was at Safway belonged entirely to Safway." *Whitehead*, 304 Md. at 76. Here, the conflicting evidence presented by the Mitchells does not permit us to draw the same conclusion in regard to Rite Aid's control over the Mitchells.[13]

---

[13] We are not persuaded by Rite Aid's argument that we must ignore Michael Mitchell's deposition testimony because it constituted inadmissible lay opinion testimony. Although the line between fact and opinion is a notoriously difficult one to draw, it is fairly clear that Michael was speaking from his personal experience in explaining who his direct supervisors were and how he interacted with Rite Aid management. Even if this constituted an opinion, we fail to see how it was not "rationally based on the perception of the witness," nor "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue," and therefore admissible. Md. Rule 5-701.

We also remain cognizant of the principle that, in assessing the factor of control, we cannot "confuse *control of the workplace with control of the worker*." *Great Atlantic & Pacific Tea Co.*, 346 Md. at 592 (emphasis added). In that sense, we agree with Rite Aid that it maintained ultimate control over its facility and, as explained by Mr. Oberosler, directed Capstone's supervisors on the services to be provided. Yet, that conclusion is not necessarily inconsistent with the prospect that the Mitchells were employees of an independent contractor free from Rite Aid's control "'in all details connected with the performance of the work except as to its product or result.'" *Injured Workers Ins. Fund v. Orient Express Delivery Serv., Inc.*, 190 Md. App. 438, 459 (2010) (quoting *L. M. T. Steel Prods., Inc. v. Peirson*, 47 Md. App. 633, 636 (1981). Again, Michael's deposition testimony suggests that Capstone workers were primarily managed by their own supervisors and would unload Rite Aid's trucks according to their own operating procedures. Of course, that would imply that Rite Aid ultimately directed which trucks to unload, but a reasonable jury could consider those directions as going to the eventual "product or result" rather than the actual details of the work.

In sum, on this record, the disputed evidence reasonably supported an inference that Rite Aid was not the Mitchells' employer. That being so, the trial court's grant of summary judgment to Rite Aid on the basis of workers' compensation immunity was erroneous.

## II.

## Premises Liability

### A. Parties' Contentions

The Mitchells, citing *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md. App. 207 (2005), posit that "Rite Aid owed [them] a duty to provide competent security personnel and security measures" responsive to the threat of an active shooter incident, which they claim was foreseeable particularly due to the recent Capital Gazette shooting in Annapolis.[14] They further contend that Rite Aid breached that duty by "failing to have security appropriately stationed at the front desk" on the day of the shooting as well as "failing to implement any active shooter training measures[.]" With respect to causation, the Mitchells aver that Rite Aid's purported negligence constituted (1) the cause-in-fact of their injuries because security personnel could have intervened to prevent or mitigate the shooting, and (2) the proximate cause of their injuries because Moseley's "strained relationship" with employees and management at the facility made her actions foreseeable.

Rite Aid counters that the circuit court correctly decided that the Mitchells failed to establish causation even assuming that it owed a duty of providing security and breached that duty by not having an assigned guard at the Liberty building. Rite Aid stresses that the Mitchells' own proffered expert, Mr. Gerard, conceded several times that even if Rite Aid "did everything correct [sic]," in his view, those measures may not have prevented the

---

[14] Counsel for the Mitchells conceded at oral argument that the circuit court did not err in granting summary judgment in favor of Abacus on Count I of the Mitchells' complaint because Abacus lacked any control over Rite Aid's Aberdeen facility.

shootings.    Further, Rite Aid emphasizes that Moseley's actions were entirely unforeseeable because there was no admissible evidence to indicate that Rite Aid was on notice of Moseley's violent intentions.  Finally, Rite Aid asserts that, because Mr. Gerard's testimony lacked an adequate foundation, the Mitchells could not point to any admissible evidence of negligence on Rite Aid's part.

### B. *Maryland Premises Liability Law and the Duty to Provide Security*

As we review the trial court's grant of summary judgment for legal correctness, we independently examine the facts properly before the court, and construe any reasonable inferences that may be drawn from them in the light most favorable to the non-moving party. *Macias v. Summit Mgmt., Inc.*, 243 Md. App. 294, 313 (2019) (quoting *Remsburg v. Montgomery*, 376 Md. 568, 579–80 (2003)).  In doing so, we are also mindful that in order to defeat a defendant's motion for summary judgment, the non-moving party "must show that there is a genuine dispute as to a material fact by proffering facts which would be admissible in evidence." *Hamilton v. Kirson*, 439 Md. 501, 522 (2014).  Because there "must be evidence upon which the jury could reasonably find for the plaintiff[,]" general allegations that "do not show facts in detail and with precision are insufficient to prevent summary judgment." *Davis v. Regency Lane, LLC*, 249 Md. App. 187, 204 (2021) (quoting *Hamilton*, 439 Md. at 522).

As with any action sounding in negligence, to prevail on a premises liability theory, the plaintiff must prove "'the existence of a duty owed by a defendant to [the plaintiff] (or to a class of which [the plaintiff] is a part), a breach of that duty, a legally cognizable causal relationship between breach of duty and the harm suffered, and damages.'" *Hancock v.*

40

*Mayor & City Council of Baltimore*, 480 Md. 588, 603 (2022) (quoting *Perry v. Asphalt & Concrete Servs., Inc.*, 447 Md. 31, 51 (2016)). The negligence decision tree breaks down further on the element of causation. Causation bifurcates into two sub-elements; namely, that "the negligence must be 1) a cause in fact, and 2) a legally cognizable cause" of the plaintiff's injuries. *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 504 (2011) (quoting *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009)).

Assuming, *arguendo*, that the Mitchells can show that Rite Aid was *not* their employer, the "safe workplace" doctrine imposes a duty upon "one who employs an independent contractor . . . to provide a safe workplace for the employees of the contractor." *Rowley v. Mayor & City Council of Baltimore*, 305 Md. 456, 465 (1986). In particular, this duty arises primarily out of the employer's status as a landowner because it is generally held that "employees of an independent contractor are invitees on the property of the landowner." *Id.* at 466.

As we recently traced in *Macias*, in the premises liability context, "the duty owed by the possessor or owner of property to a person injured on the property is determined by the entrant's legal status at the time of the incident." 243 Md. App. at 316. As a general matter, the "highest duty is owed to an invitee[,]" the class of persons "invited or permitted to enter or remain on another's property for purposes connected with or related to the owner's business." *Id.* at 322 (quoting *Bramble v. Thompson*, 264 Md. 518, 521 (1972)). "[A] property owner must use reasonable care to inspect and make the premises safe for invitees." *Id.* at 322. However, that duty is limited in the sense that the "plaintiff must show that the landowner had actual knowledge of the defect or 'by the exercise of

41

reasonable care would discover the condition.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 343 (AM. LAW INST. 1965)).

More narrowly, we have recognized several times that a landowner may have a duty to protect invitees from foreseeable criminal activity perpetrated by third parties[15] when the landowner has "past experience that indicates a likelihood of conduct by third persons in general, or conduct by a particular individual who is likely to harm an invitee." *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md. App. 207, 221 (2005). This line of cases descends from the Maryland Supreme Court's decision in *Scott v. Watson*, in which the decedent in the plaintiff's wrongful death and survival action had been shot and killed in his apartment's garage. 278 Md. 160, 162 (1976). The *Scott* Court explained that when a landlord (or other landowner) "knows, or should know, of criminal activity against persons or property in the common areas, he then has a duty to take reasonable measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity." *Id.* at 169. In other words, "[t]he duty in that situation is to provide reasonable security measures to eliminate foreseeable harm" to invitees or tenants on the property. *Davis,* 249 Md. App. at 210.

---

[15] The parties do not contend that Moseley was an employee of Rite Aid. In their principal brief, the Mitchells concede that Rite Aid could not be held liable under a negligent hiring theory precisely because "[Moseley] was not an employee of Rite Aid, and therefore Rite Aid is not liable for negligently hiring, retaining, and supervising Moseley." Accordingly, we analyze this case under the framework of a premises owner or occupier's duty to prevent foreseeable harm to a business invitee perpetrated by *another* third-party invitee. *See e.g.*, *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476 (2011) (analyzing premises owner's duty to prevent harm perpetrated by bar patron against another bar patron).

In *Troxel v. Iguana Cantina, LLC*, we reviewed the three most common scenarios in which that duty might arise:

> Under the first theory, a duty is imposed on the landowner to eliminate conditions that contribute to criminal activity if the landowner had prior knowledge of *similar criminal activity*—evidenced by past events—occurring on the premises. In the second scenario, a duty is imposed on the landowner to prevent criminal conduct of a specific assailant if the landowner is aware of the violent tendencies of *that particular assailant.* The third category involves the imposition of a duty on a landowner if the landowner had knowledge of events *occurring immediately before* the actual criminal activity that made imminent harm foreseeable.

*Troxel*, 201 Md. App. 476, 497 (2011) (cleaned up) (emphasis in the original).

*Troxel*, much like *Scott*, dealt with the first scenario, as Troxel brought suit against Iguana Cantina to hold it liable for an assault perpetrated against him due to a history of criminal activity in and around the establishment. *Id.* at 485. Given the evidence presented, we concluded that Iguana Cantina had been under a duty to provide reasonable security measures as it was on notice of extensive criminal activity on the premises, especially during its "college nights." *Id.* at 498. As we noted, during the months leading up to the assault, Troxel presented evidence of "four aggravated assaults, one robbery, and two assaults on police officers, all occurring inside Iguana Cantina." *Id.* That was in addition to testimony from Zachary Belcher, a former Iguana Cantina security guard who stated in an affidavit that, as a security guard at Iguana Cantina, "he 'experienced up to five fights per night on college nights.'" *Id.* Moreover, "[a]nother Iguana Cantina security guard, Charles E. Shannon, Jr., testified at his deposition that there were probably more fights that occurred on a 'college night' than any other night." *Troxel*, 201 Md. App. at 498. We held that, under those circumstances, Iguana Cantina was on notice of criminal activity and was

43

therefore under a duty to protect its invitees, such as Troxel, from foreseeable harm. *Id.* at 502-03.

*Corinaldi* involved the third scenario. In that case, a shooting occurred after a party in two adjoining hotel rooms was allowed to grow out of control. *Corinaldi*, 162 Md. App. at 213-16. The evidence tended to show that hotel employees knew of the party and had "knocked on the door of one of the rooms and requested the occupants to lower the noise level and stop letting people in through the side door." *Id.* at 214. Then, after several of the male attendees got into a heated argument, the hostess of the party advised hotel employees that "there were several people in the rooms she did not know, that the party was getting out of control, and that one of the attendees had a gun." *Id.* at 215. The hotel employees, however, waited ten minutes to call the authorities, during which time Corinaldi, the decedent, was shot and killed. *Id.* at 215-16. We explained that—although a "verbal altercation alone is insufficient to presage physical violence"—under these facts, a reasonable jury could have found that "imminent harm was foreseeable when appellees were advised that an attendee of the party had a gun." *Id.* at 228. Consequently, we reversed the trial court's grant of summary judgment. *Corinaldi*, 162 Md. App. at 228.

Of course, even where a duty has arisen because the owner or possessor of the premises is on notice of foreseeable criminal activity, the plaintiff still must prove a breach of that duty. As a general matter, a breach occurs "when a person or entity fails to conform to an appropriate standard of care and, in doing so, fails to protect third persons against unreasonable risks." *Troxel*, 201 Md. App. at 501. In *Troxel*, for example, we held that summary judgment was inappropriate because a reasonable factfinder could have found a

44

breach of the duty to provide adequate security measures. *Id.* at 502-03. Specifically, we noted that there existed reasonable inferences "that Iguana Cantina should have had more security guards patrolling the nightclub, or should have had security guards stationed in more strategic locations, or should have abandoned the 'college night' promotion altogether." *Id.* at 503.

Finally, the plaintiff also must prove the element of causation. To be the proximate cause of an injury, "the negligence must be 1) a cause in fact, and 2) a legally cognizable cause." *Id*. at 504 (quoting *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009)). First, the plaintiff must show that the defendant's conduct was a but-for cause of plaintiff's injuries, or, if one of multiple causes, that "it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.* at 504-05. Second, the plaintiff must demonstrate the defendant's negligence was "legally cognizable," an inquiry which "involves a determination of whether the injuries were a foreseeable result of the negligent conduct." *Id.* at 505 (quoting *Pittway*, 409 Md. at 246).

Although a third-party's criminal act often constitutes an unforeseeable superseding cause, proximate causation may nonetheless be established when an actor's "negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime" and "the actor at the time of his negligent conduct *realized or should have realized the likelihood that such a situation might be created,* and that a third person *might avail himself of the opportunity to commit such a tort or crime.*" *Troxel*, 201 Md. App. at 509-10 (emphasis in the original) (quoting RESTATEMENT (SECOND) OF TORTS § 448 (AM. LAW INST. 1965)).

45

## C. Premises Liability in the Context of Mass Shootings

Although we have not yet addressed a premises liability claim arising out of a mass shooting, our sister states have. From these cases, we glean additional insight into the evidence necessary to hold a property owner liable for the actions of a third-party shooter.

In *Shadow v. Federal Express Corporation*, the Georgia Court of Appeals upheld a grant of summary judgment in favor of the appellee-landowner, FedEx, on a premises liability claim brought by an employee who was the victim of a mass shooting at FedEx's Kennesaw facility. 860 S.E.2d 87 (Ga. App. 2021) *cert. denied*, 860 S.E.2d 87, Case No. S21C1201 (Feb. 1, 2022). There, the evidence adduced during discovery demonstrated that there had been a shooting at another FedEx facility in Illinois as well as several "reports of threats at the Kennesaw facility in the five years leading up to the Kennesaw facility shooting[.]" *Id.* at 90. These included: (1) "a January 2011 matter in which a contractor's terminated employee commented that he was on the premises to 'see who I'm going to shoot first'"; (2) "a February 2011 incident in which a package handler threatened to stab and kill another employee"; and (3) "an altercation in which an employee stated she would slap another employee before committing an assault in the parking lot." *Id.* Nonetheless, the trial court granted summary judgment because "the prior incidents were not sufficiently similar, and, although there had been some prior threats made toward the guards, the threats were only verbal and never involved [the shooter]." *Id.*

The Georgia Court of Appeals agreed and affirmed the judgment. As the Court explained, under Georgia law, to establish foreseeability from the vantage point of a property owner, "the incident causing the injury must be substantially similar in type to the

46

previous criminal activities occurring on or near the premises so that a reasonable person would take ordinary precautions[.]" *Id.* at 91 (quoting *Sturbridge Partners, Ltd. v. Walker*, 482 S.E.2d 339, 341 (Ga. 1997)). Under that standard, the evidence in Shadow's case fell short. In the Court's view, the prior shooting at the Illinois facility was substantially dissimilar because it "involved a targeted domestic violence attack, the shooter was not a [FedEx] Ground employee, and he did not injure anyone except himself[.]" *Shadow*, 860 S.E.2d at 92. The Court emphasized, with regard to the prior threats of violence at the Kennesaw facility, that "the majority of the workplace violence reports involved only verbal threats; no one was injured; there was no weapon involved" and thus "none of them would have reasonably alerted the defendants to the foreseeability of a random mass shooting." *Id.*

By contrast, in *Piazza v. Kellim*, the Oregon Supreme Court held that a premises liability claim brought against the operators of a nightclub, outside of which a mass shooting occurred, should not have been decided on a motion to dismiss. 377 P.3d 492 (Or. 2016). In *Kellim*, the pleadings established that there were several prior incidents of violence of which the owners of the nightclub were assuredly aware. *Id.* at 495. Specifically, several years prior, "a shooter fired into a crowd of people standing outside the nightclub, striking three people." *Id.* That was in addition to a well-documented "history of fights and assaults in the line outside the nightclub." *Id.* More generally, "the area surrounding the [club] had experienced violent crimes before the 2009 shooting" including "'recurrent incidents of violence,' that were 'linked by police to gang activity and to clubs in the district exceeding capacity and serving too much alcohol.'" *Id.* Despite

47

those allegations, the trial court dismissed the plaintiff's claim, finding that "the shooting that killed [the decedent] was unforeseeable as a matter of law" because it was a random act of violence which coincidentally occurred in a high-crime area. *Kellim*, 377 P.3d at 498.

The Oregon Court of Appeals reversed the judgment of dismissal and the Oregon Supreme Court affirmed. As the Supreme Court explained, although prior criminal incidents sufficient to trigger a duty on the part of the landowner may not be entirely remote or dissimilar, they need not be identical either and "the proper level of generality at which to compare the criminal history on which plaintiff relies and the shooting in this case is to treat both as falling within the category of violent assaults." *Id.* at 506. Otherwise, when a proprietor is aware that "assaultive conduct can be anticipated where people are waiting in line to enter its premises, it rings hollow to suggest that a specific crime pattern triggers the owner's duty to protect patrons only with regard to those specific crimes[.]" *Id.* at 507. The Court determined that plaintiff's allegations sufficiently demonstrated a "history of violent assaults, including gun violence, at and in the neighboring vicinity of the [nightclub], and a known risk of such violence in the future." *Id.* Dismissal was improper, therefore, because those allegations would "permit a reasonable trier of fact to determine that a reasonable person in the position of the [nightclub] defendants reasonably would have foreseen a risk of violent assault on the public sidewalk outside the nightclub[.]" *Id.*

Along the same vein, the United States District Court for the District of Colorado declined to grant the defendant-premises owner's motion for summary judgment in a case arising out of the Aurora movie theater shootings. *Axelrod v. Cinemark Holdings, Inc.*, 65

48

F. Supp. 3d 1093, 1096 (D. Colo. 2014). In *Axelrod*, the shooter purchased a ticket for a premiere showing of "The Dark Knight Rises," left the auditorium during the previews, propped the theater door open, went to his car, "donned body armor and a gas mask, and armed himself with a tear gas canister, a shotgun, a rifle, at least one handgun, and extra ammunition." *Id.* Then, "[t]wenty minutes after the movie started [he] reentered the auditorium through the exit door, disbursed tear gas, and began randomly shooting patrons[,]" killing twelve and wounding many more. *Id.* The plaintiffs, survivors of the incident and family members of the deceased, brought suit against the owner and operator of the theater, Cinemark, on the theory that the tragedy "could have been prevented had the defendants taken reasonable steps to provide security[.]" *Id.* In fact, the evidence established that although "80 of Cinemark's approximately 300 theaters did engage off-duty policemen or other security personnel to patrol their theaters for the midnight premiere of The Dark Knight Rises[,]" the manager of the Aurora theater opted not to do so. *Id.* at 1102. Cinemark, in turn, responded that the incident was "so unprecedented as to be legally unforeseeable" and moved for summary judgment. *Id.*

The court, looking to a 1987 premises liability case involving a mass shooting in California, approved of the California Court of Appeals' reasoning that a "deranged and motiveless attack" was *then* so unlikely to occur "that a reasonably prudent business enterprise would not consider its occurrence in attempting to satisfy its general obligation to protect business invitees from reasonably foreseeable criminal conduct." *Axelrod*, 65 F. Supp. 3d at 1099 (quoting *Lopez v. McDonald's Corp.*, 193 Cal. App. 3d 495, 509-10

49

(1987)).  Yet, the court noted that the situation had changed significantly since the occasion

of the *Lopez* attack in 1984:

> I do not disagree at all with the holding in the *Lopez* case.  But what was "so unlikely to occur within the setting of modern life" as to be unforeseeable in 1984 was not necessarily so unlikely by 2012.  Cinemark itself acknowledges in its reply brief some of the grim history of mass shootings and killings that have occurred in more recent times.  The school shootings at the University of Texas in 1966, Columbine High School in 1999, and Virginia Tech in 2007 are just a few of the most highly publicized incidents.  If one Googles "mass shooting incidents" one finds dozens of lists of the major incidents.  For example, an article by the staff of the *Los Angeles Times* published on April 2, 2014[,] lists 31 mass shooting incidents between the San Ysidro McDonald's disaster and the Aurora shootings.  These incidents occurred in schools, businesses, military bases, shopping malls, a supermarket, on a train, in an immigration center and, as we now know, in a theater.

*Id.* (cleaned up).  Therefore, considering the evidence presented by the plaintiffs suggesting

that Cinemark was aware of the risk of a mass shooting in one of its theaters, the court

declined to grant Cinemark's motion for summary judgment.  *Id.* at 1101-03.

Finally, in *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d 287

(Colo. 2020), the Supreme Court of Colorado reversed a grant of summary judgment on a

premises liability claim arising out of a mass shooting.  There, the evidence showed that in

2015, after a series of misleading videos circulated online "purporting to show Planned

Parenthood staff discussing methods of obtaining fetal organs and tissue for medical

research[,]" violent backlash against the organization resulted in "threats to blow up such

facilities and threats of violence against individuals associated with them." *Id.* at 289.  The

shooter, after seeing the videos, "went to the [Rocky Mountain Planned Parenthood, Inc.

("PPRM")] facility in Colorado Springs with eight guns of various sorts, propane tanks that

he believed would explode if he shot at them, and a homemade ballistic vest" and

50

proceeded to shoot and kill several members of PPRM staff before engaging "in a five-hour shootout with police who had arrived on the scene." *Id.* The employee-plaintiffs filed suit against PPRM and their claims were adjudicated by way of summary judgment in favor of the defendant-employer. *Id.* at 289-90.

The case made its way to the Supreme Court of Colorado, which held that the grant of summary judgment was improper due to the existence of material facts in dispute. Distinguishing the *Wagner* case at bar from prior cases involving the tragic Columbine and Aurora theater shootings, the Court emphasized that those incidents "involved random and extreme acts of violence committed without warning or foreseeable motive" and therefore did not establish foreseeability as a matter of law. *Id.* at 294. The *Wagner* case, however, "involved a similar act of extreme violence, but this act was committed at a facility that had long been the subject of known threats of such violence, making the likelihood of an event like that which occurred less remote and arguably more foreseeable." *Wagner*, 467 P.3d at 294. Indeed, the Court emphasized that PPRM had long been aware of the threat of violence at its facilities and "knew that the level of threats of violence and criminal activity directed against Planned Parenthood facilities increased exponentially in the aftermath" of the controversial videos. *Id.* at 293. Accordingly, the Court found that it could not "preclude, as a matter of law, the possibility that a reasonable jury could find PPRM's allegedly insufficient security measures to have been a substantial factor in causing the plaintiffs' injuries[.]" *Id.* at 294.

## D. Analysis

### 1. Duty

As we explained in *Troxel*, to avoid summary judgment on a premises liability claim arising out of the criminal act of a third party, the plaintiff must show that such activity was foreseeable. *Troxel*, 201 Md. App. at 491, 497. That showing can be made in one of three ways. First, the plaintiff can show that the "landowner had prior knowledge of *similar criminal activity*—evidenced by past events—occurring on the premises." *Id.* Second, the plaintiff can demonstrate that "the landowner is aware of the violent tendencies of [a] *particular assailant.*" *Id.* (emphasis in the original). Third, the plaintiff can provide evidence that the "landowner had knowledge of events *occurring immediately before* the actual criminal activity that made imminent harm foreseeable." *Id.* (emphasis in the original). Ultimately, the Mitchells cannot prevail on any of these theories.

To start, the Mitchells do not and cannot demonstrate that there was a history of criminal activity at the facility which would have put Rite Aid on notice that a targeted shooting might occur there. Understandably, the Mitchells focus their arguments on the second and third *Troxel* theories, but neither avail. On the second theory—*i.e.*, that Rite Aid was on notice of the violent tendencies of Moseley—the Mitchells do not marshal any admissible evidence to demonstrate that was the case. The Mitchells point to statements from Rite Aid manager Chris Fisher contained within the Harford County Sheriff's Incident Report that (1) Moseley had argued with coworkers after cutting in line to clock in and (2) Moseley had been having issues with transportation to work. Even assuming that these statements might be admissible as non-hearsay for the purpose of proving notice,

52

they hardly demonstrate that Fisher, as Rite Aid's agent, was aware of any violent tendencies on Moseley's part. As Fisher explained, Rite Aid employees cut in line as well and there was no indication that the incident was anything more than a minor verbal spat between coworkers.

Nor does the other evidence relied on by the Mitchells fare any better. For instance, the Mitchells point to Haissaun's deposition testimony that he had "heard" Moseley was being harassed because of her sexuality. He did not mention whether anyone employed by Rite Aid ever heard the same rumor. And admissibility problems aside, it does not automatically follow that an individual who has been harassed is going to explode in violence.

The Mitchells also rely heavily on an isolated reference within the Sheriff's Report which indicated that officers found a "disciplinary action form" for Moseley when they searched her vehicle. As the circuit court noted, however, the form itself was never produced during discovery. Accordingly, there was no evidence presented to suggest when the form was issued or what conduct of Moseley it purported to address. Certainly, there was nothing to suggest that Rite Aid, rather than Abacus or one of Moseley's prior employers, issued the form. But more fundamentally, as with the evidence of Moseley's transportation issues and having cut in the clock-in line, all of these allegations, even if proven, do not charge Rite Aid with knowledge of Moseley's violent tendencies within the meaning of *Troxel*.

This result is sustained as to the Mitchells' arguments under the third *Troxel* theory—that Rite Aid "had knowledge of events occurring immediately before the actual

criminal activity that made imminent harm foreseeable." *Troxel*, 201 Md. App. at 497 (cleaned up). In *Corinaldi*, we concluded that the fact that there was an argument among patrons at the hotel did not "indicate that appellees' agents had any information that violence might be imminent" because "[a] verbal altercation alone is insufficient to presage physical violence." *Corinaldi*, 162 Md. App. at 227. Indeed, we explained that if the evidence merely established that an argument preceded the shooting, summary judgment would have been appropriate "because the evidence would be insufficient to permit a jury to find that the infliction of harm was foreseeable." *Id.* at 227-28. Rather, we found that the hotel employees' delay in alerting the authorities after learning of the presence of a firearm was the key consideration. *Id.* at 228. That element is not present here. As noted, the Mitchells can at most establish that Moseley had a verbal spat with a co-worker after cutting before her in line. It was not reported that the verbal exchange included any violent or threatening words. Moreover, in contrast to *Corinaldi*, there is nothing to indicate that Rite Aid had any awareness of Moseley having a gun.

In sum, the evidence produced by the Mitchells failed to establish that Rite Aid had any duty to provide heightened security measures to protect employees at the facility from Moseley, or from potential active shooter situations. Under the framework established by Maryland decisional law, the Mitchells did not establish that Moseley's attack was a reasonably foreseeable criminal act because (a) there was no history of violent criminal activity in the vicinity of facility, (b) there was no indication that Moseley posed a threat of violence, and (c) the events immediately preceding the shootings did not presage any imminent violent outburst. Thus, because Rite Aid lacked any notice, its duty as a

54

possessor "to take *reasonable* measures . . . to eliminate the conditions contributing" to foreseeable criminal activity was never generated. *Troxel*, 201 Md. App. at 496-97 (emphasis in original).

We caution that, as grim statistics and the development of the law in our sister states foreshadow, the standards of care surrounding a business owner's duty to protect invitees from gun violence are not static and will continue to evolve in light of "common sense perceptions of the risks created by various conditions and circumstances." *Axelrod*, 65 F. Supp. 3d at 1100. As the *Axelrod* court put it, "foreseeability includes whatever is likely enough *in the setting of modern life* that a reasonably thoughtful person would take account of it in guiding practical conduct[.]" *Id.* at 1100 (emphasis in original). Indeed, there are certainly identifiable situations in which a premises liability claim arising out of a mass shooting incident would properly be submitted to a jury, such as in *Piazza*, where there was a history of violent assaultive activity in and around the premises; or, as in *Wagner*, where there existed a clear and credible threat of violence either against a particular facility or from a particular assailant. *Piazza*, 377 P.3d at 495; *Wagner*, 467 P.3d at 294. Respectively, the factual posture of those cases would fit seamlessly under the first (history of criminal activity in the vicinity) and second (threat from a particular assailant) *Troxel* scenarios. Trial courts should carefully analyze the evidence presented on foreseeability in such cases under the *Troxel* and *Corinaldi* framework in light of the ever-evolving considerations of public policy which are so intertwined with that inquiry. *See Scott v. Watson*, 278 Md. 160, 171 (1978) (the "determination of proximate cause is subject to considerations of fairness and social policy as well as mere causation.").

55

## 2. *Causation*

The circuit court held that the Mitchells did not present sufficient evidence on the element of causation to generate a triable issue of fact. We agree and therefore affirm the trial court's grant of summary judgment on those grounds as well. As we have explained, the element of causation consists of a two-pronged inquiry.

First, on the cause-in-fact prong, the plaintiff must show that the defendant's conduct was a but-for cause of the plaintiff's injuries, or, if one of multiple causes, that "it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Troxel*, 201 Md. App. at 505. Here, the evidence produced by the Mitchells on this point failed to generate any material issue of fact on this first prong. Although Mr. Gerard, the Mitchells' proffered security expert, identified a number of issues with Rite Aid's security protocols, he could not identify any causal link between the perceived breaches and the Mitchells' injuries.

To the contrary, we note that, unlike in *Axelrod*—where the shooter was effectively unimpeded in propping the door to the theater open—Rite Aid's facility already had a number of security measures in place. As Mr. Oberosler explained, the Liberty Building was protected by *two* layers of access controls, one at the front gate and another at the front door, limiting access to those with an ID badge. Mr. Oberosler also noted that, as a whole, the Aberdeen facility had around 30 or 31 security guards on staff that operated on a 24-hour shift with assigned guards at all times. Although guards were not always posted at the Liberty Building, there would be approximately four or five security guards deployed throughout the facility and monitoring the Liberty Building through patrols.

56

Mr. Gerard may have identified some potential shortcomings, but he was unable to connect any of those perceived deficiencies to the Mitchells' injuries. Specifically, Mr. Gerard agreed that even if the best training and active shooter drills had been employed at the facility prior to the date of the incident, they may not have prevented the shooting in this case. He also agreed that even if the access system on the main door was operating 100% properly on the day of the incident, Moseley would still have been able to gain access to the building by using her access card. He agreed that if the access door had been working that day, there was no requirement by industry standards to have a security guard on site. But even if a guard had been posted at the entrance because the door was malfunctioning, Mr. Gerard agreed that there was no reason to believe that the guard would not have been shot, injured or killed by Moseley. Clearly, it would not have prevented Moseley from killing the worker who was standing outside the building. Finally, Mr. Gerard even agreed that if Rite Aid had done everything correctly, in his opinion, that he could not say that the incident would not have occurred, or that people would not have been injured or killed. Given all of those concessions, we must conclude that the Mitchells did not establish any causal link between the extra security measures suggested by Mr. Gerard and the injuries which they suffered.

The second requirement in establishing proximate cause is proof that plaintiffs' "injuries were a foreseeable result of the negligent conduct." *Troxel*, 201 Md. App. at 505. In the context of a third-party's criminal act, proximate cause may be established when an actor's "negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime" *and* "the actor at the time of his negligent conduct

57

*realized or should have realized the likelihood that such a situation might be created,* and that a third person *might avail himself of the opportunity to commit such a tort or crime.*" *Id.* at 509-10 (emphasis in the original) (quoting RESTATEMENT (SECOND) OF TORTS § 448 (AM. LAW INST. 1965)). As we have detailed in discussing foreseeability as a component of the duty element of negligence, the Mitchells simply did not produce any evidence indicating that Rite Aid was on notice that Moseley posed a threat of violence to the other workers at the facility. Moreover, as set forth by Mr. Oberosler, considering the baseline security measures already in place at the Rite Aid facility—including two layers of access controls and patrolling security guards—it is unclear exactly how Rite Aid realized or should have realized it "created a situation which afforded an opportunity to the third person to commit such a tort or crime." *Troxel*, 201 Md. App. at 509-10. That being the case, the Mitchells failed to generate any triable issue of fact on the foreseeability component of proximate cause.

Accordingly, on this record, we must agree with the circuit court that "this is a case where there's no genuine dispute as to a material fact regarding foreseeability." Thus, because the Mitchells did not produce evidence demonstrating that Rite Aid's purportedly negligent security measures were the cause of their injuries, summary judgment was properly granted.

## III.

## Negligent Hiring and Supervision

### A. *Moseley's Employment with Abacus*

As part of their claim against Abacus, the Mitchells took the deposition of Michael Brady, Abacus's CEO. Mr. Brady explained that Moseley was hired by Abacus and assigned to work in Rite Aid's Aberdeen facility as a picker. She had only been with the company a very short time before the incident and Mr. Brady noted that "[t]here was zero in terms of reported discipline or misconduct" nor any indication that Moseley was being harassed in any way. Mr. Brady maintained that Abacus was not given any notice that Moseley had left the facility on the morning of the shootings and that she would have been subject to discipline for doing so.

Mr. Brady also explained that Moseley's employment application included a standard background check and drug screening. As Mr. Brady noted, "[t]here was no criminal history at all reported back on her background check" because the investigation did not search for traffic infractions. Mr. Brady also stated that Moseley passed a drug screening. Although Moseley had struggled with financial issues and mental health, Mr. Brady stressed that Abacus was not aware of those problems because, he explained, they do not "ask [] employees medical questions" or conduct a credit check as part of its standard third-party background investigation. If a drug screening were to come back positive for a substance with medical uses, however, Mr. Brady explained that Abacus would verify whether the prospective employee had a valid prescription.

## B. Parties' Contentions

The Mitchells contend that Abacus "had more than enough notice of [Moseley's] incompetence and personal struggles" and therefore breached its duty to use "reasonable care to select employees competent and fit for the work assigned to them." They point to evidence contained within the Harford County Sheriff's report that Moseley had argued with coworkers, was harassed due to her sexual orientation, cut in line to clock in for the day, and had been given a disciplinary action form later found by law enforcement. Therefore, the Mitchells aver that Abacus's failure to remove Moseley from the facility when on notice of her "strained relationship" with her co-workers was the proximate and legal cause of their injuries.

To the contrary, Abacus maintains that it acted with reasonable care in hiring Moseley and that there is no admissible evidence that it was on notice of her "incompetence." Abacus emphasizes that a "full background check" failed to reveal any criminal convictions and that there was no admissible evidence that Moseley had any disciplinary actions or reports of misconduct. Accordingly, without any admissible evidence that Abacus breached its duty of care in selecting competent and fit employees, Abacus contends that summary judgment was properly granted.

## C. Summary Judgment Was Proper

Generally, "an employer has a duty 'to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee[.]'" *Perry v. Asphalt & Concrete Servs., Inc.*, 447 Md. 31, 52 (2016) (quoting *Henley v. Prince George's Cnty.,* 305 Md. 320, 336 (1986)). In pressing a claim

60

for negligent hiring, supervision, or retention, the plaintiff must prove the existence of five elements: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring, supervising or retaining the employee as the proximate cause of plaintiff's injuries." *Latty v. St. Joseph's Soc. Sacred Heart, Inc.*, 198 Md. App. 254, 272 (2011), *abrogated on other grounds by Plank v. Cherneski*, 469 Md. 548 (2020) (cleaned up). At the least, employers are required to "make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee." *Evans v. Morsell*, 284 Md. 160, 167 (1978). However, the "nature and extent of the inquiry that is needed will naturally vary with the circumstances." *Id.*

In this case, we certainly accept that Abacus had a duty to provide fit and competent workers to its clients and that this duty extended to other temporary workers at the Rite Aid facility, such as the Mitchells, with whom Abacus workers were likely to come in contact. However, the record reflects that Abacus conducted a reasonable inquiry into Moseley's fitness as an employee that simply failed to reveal certain red flags which tend to evade most standard background checks. As the circuit court noted, Abacus "conducted State and Federal criminal background checks, they conducted a drug screen, which resulted in no positive urines, no positive indication that [Moseley] had a substance abuse issue." Mr. Brady also explained that "[t]here was no criminal history at all reported back on her background check." Abacus, therefore, had no reason to know of Moseley's mental health

61

issues because they had never manifested in any identifiable criminal or disciplinary charges.

The Mitchells also point to several facts in the record which it claimed Abacus negligently overlooked in retaining Moseley. As to each point, we agree with the circuit court that the Mitchells failed to generate a genuine dispute of material fact so as to defeat Abacus's motion for summary judgment. First, the Mitchells emphasize that Moseley had several traffic citations pending, which Abacus failed to discover in the course of its background check. As the circuit court explained, it is difficult to see how the existence of those citations "would put the employer, Abacus, on notice that she was some type of violent threat." It is a large leap to posit that, because an individual has driven with expired tags, they threaten to engage in a mass shooting targeting their co-workers. Perhaps that result could be reached when considering the citations in context with other evidence tending to indicate Moseley's propensity toward violence, but as we will explain, the Mitchells failed to put forth any such evidence.

Next, the Mitchells point to an isolated reference in the Harford County Sheriff's Incident Report indicating that officers found a "disciplinary action form" in Moseley's vehicle. Yet, as the circuit court ably described, the form was not produced in evidence so there is nothing to indicate when it was issued; what incident it purported to address; or whether it was issued by Rite Aid, Abacus, or a prior employer. As Mr. Brady explained, "[t]here was zero in terms of reported discipline or misconduct" in Moseley's file. At most, the Mitchells could only point to an isolated statement from Chris Fisher that Moseley had been having transportation issues which were later resolved.

62

Finally, the Mitchells stress that Abacus was on notice of Moseley's issues with her co-workers at the Rite Aid facility. Specifically, they point to (1) witness statements contained within the Sheriff's Incident Report that Moseley had gotten into an argument with coworkers after she cut in line to clock in on the morning of the shootings and (2) Haissaun's deposition testimony that "I've heard her and somebody else had problems and she – that pretty much she was getting made fun of for her sexuality." This argument falls short for a couple reasons. First of all, there is an admissibility problem. Although the Sheriff's Report itself might be admissible under the public records exception to the rule against hearsay, Md. Rule 5-803(b)(8), the witness's statements *to the officers* contained within the report are hearsay without any apparent exception. The same is true for the rumors of harassment set forth by Haissaun. Second, and more importantly, the Mitchells again do not explain how *Abacus* was on notice of any of these issues when they occurred at Rite Aid's facility.

We conclude that the trial court correctly found that the Mitchells failed to set forth any admissible evidence that Abacus was aware of anything about Moseley that suggested she should not be hired or should have been removed from the Rite Aid facility because she was violent, or mentally ill, or posed a threat to anyone. Accordingly, we hold that the circuit court did not err in granting summary judgment in favor of Abacus because, absent any admissible evidence of its negligence, it was entitled to judgment as a matter of law.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID ONE-THIRD BY APPELLEE RITE AID AND TWO-THIRDS BY APPELLANTS.**

63

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0021s22cn.pdf

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0021s22cn2.pdf